UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JASON EARLEY COTTER,

                Plaintiff,

                                        Case No. 23-cv-1592-pp

    v.

CHIEF CRAIG FREITAG, *et al.*,

                Defendants.

---

**ORDER GRANTING PLAINTIFF'S MOTION TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 2) AND SCREENING COMPLAINT**

---

On November 27, 2023, the plaintiff—who is representing himself—filed a complaint against several members of the Clintonville, Wisconsin Police Department and the City of Clintonville. Dkt. No. 1. The plaintiff also filed a motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

This order addresses the plaintiff's motion for leave to proceed without prepaying the filing fee and screens the complaint.

**I.    Motion to Proceed Without Prepaying the Filing Fee (Dkt. No. 2)**

    A.    <u>Legal Standard</u>

An indigent federal plaintiff "may commence a civil action without prepaying fees or paying certain expenses." <u>Coleman v. Tollefson</u>, 575 U.S. 532, 534 (2015). To qualify to proceed without prepaying the filing fee, a plaintiff must fully disclose his financial condition and must do so truthfully under penalty of perjury. <u>See</u> 28 U.S.C. §1915(a)(1) (requiring the person seeking to

1

proceed without prepayment to submit "an affidavit that includes a statement of all assets [they] possess[]"). If the plaintiff demonstrates that he is unable to pay the filing fee, the court still must decide whether the plaintiff has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

      B.    <u>Plaintiff's Financial Status</u>

The plaintiff's affidavit avers that he is not employed, but that he receives $914 a month in "SSI benefits." Dkt. No. 2 at 1-2. The plaintiff attests that he is not married and that he has two dependent children. <u>Id.</u> at 1. Next to both dependents the plaintiff wrote "have and support 50%." <u>Id.</u> at 1. The plaintiff avers that he has $350 in monthly expenses ($250 in rent and $100 in phone bills). <u>Id.</u> at 2. He avers that he does not own a car, a home or any other property of value. <u>Id.</u> at 3-4. The plaintiff reports that he has 53 cents in cash or in a checking or savings account. <u>Id.</u> at 3.

Under "Other Circumstances" the plaintiff states, "I ask that the court appoint an attorney to navigate and litigate the complexities in this case." <u>Id.</u> at 4. He says, "I am simply unequipped[,] uneducated, and unable to so with any real effectiveness." <u>Id.</u>

      C.    <u>Analysis</u>

Based on the information in the affidavit, the court concludes that the plaintiff does not have the ability to pre-pay the filing fee. Although the plaintiff's monthly income exceeds his monthly expenses, the difference

2

between these two amounts is not substantial and the plaintiff reports that he has less than one dollar in cash or in an account. Id. at 2-3. The only monthly expenses the plaintiff listed are for rent and phone payments. Id. The court suspects that the plaintiff likely has additional expenses—like food and clothing—that he did not list. For these reasons, the court will grant the plaintiff's motion for leave to proceed without prepaying the filing fee.

The court advises the plaintiff, however that he still is responsible for paying the filing fee over time. Robbins v. Switzer, 104 F.3d 895, 898 (7th Cir. 1997); see also Rosas v. Roman Catholic Archdiocese of Chi., 748 F. App'x 64, 65 (7th Cir. 2019) ("Under 28 U.S.C. § 1915(a), a district court may allow a litigant to proceed 'without *prepayment* of fees,' but not without ever paying fees.") (emphasis in original)). When a court grants a motion allowing a plaintiff to proceed without prepaying the filing fee, it means only that the person does not have to pre-pay the full filing fee up front; the plaintiff still owes the filing fee. He must pay it over time as he is able.

## II.    Screening the Complaint

### A.    Legal Standard

The court next must decide whether the plaintiff has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case

3

under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). A plaintiff does not need to plead every fact supporting his claims; he needs only to give the defendants fair notice of the claim and the grounds upon which it rests. Twombly, 550 U.S. at 555 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

The complaint must contain allegations that "'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth. Id. at 663-64. In evaluating plausibility, the court looks at the complaint and "documents that are attached to the complaint, documents that are central to the complaint and are referred to in

4

it, and information that is properly subject to judicial notice." <u>Williamson v. Curran</u>, 714 F.3d 432, 436 (7th Cir. 2013). A document filed by a person who is representing himself must be "liberally construed," and "'however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976)). <u>See also</u>, <u>Cesal</u>, 851 F.3d at 720 (citing <u>Perez v. Fenoglio</u>, 792 F.3d 768, 776 (7th Cir. 2015)).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of that right was acting under the color of state law. <u>D.S. v. E. Porter Cnty. Sch. Corp.</u>, 799 F.3d 793, 798 (7th Cir. 2015) (citing <u>Buchanan–Moore v. County of Milwaukee</u>, 570 F.3d 824, 827 (7th Cir. 2009)).

B.    <u>The Plaintiff's Allegations</u>

The complaint names the following defendants: Chief Craig Freitag, Captain Dennis Schroeder, Sgt. Chris Wendorf, Officer Tyler Bartel, Officer Kyzewski[1] and the City of Clintonville. <u>Id.</u> Finally, the plaintiff lists "Officer(s) Unknown of The Clintonville Wisconsin Police Dept." Dkt. No. 1 at 2.

1.    *Vehicle Stop and Resulting Searches*

The complaint alleges that "[l]ate in the evening on November 18th, 2020 and into the early morning November 19, 2020," Officer Tyler Bartel of the

---

[1] The plaintiff sometimes spells this defendant's name "Kyzewski" and other times spells it "Kizewski."

Clintonville Police Department stopped a vehicle being driven by Devon Caswell. Dkt. No. 1 at 2. The plaintiff alleges that he was a passenger in the stopped vehicle and that at the time, he was in a relationship with Ms. Caswell. Id. at 2, 4, 10. He alleges that "Officer Bartel informed Ms. Caswell and [the plaintiff] that he pulled their vehicle over due to the fact that the vehicle was not displaying license plates; however the police report indicates that Bartel pulled the vehicle over due to an unspecified inadequate muffler." Id. at 2-3. According the complaint, "Ms. Caswell explained to the officer that they had bought the vehicle only the day before[,]" and "provided Officer Bartel with papers relating to the new vehicle" as well as "her driver's license." Id. at 3.

The plaintiff alleges that "Officer Bartel went back to his vehicle, called Dispatch, requested a K9 unit, and waited for the K9 unit to arrive." Id. He contends that "Officer Bartel did not inform Ms. Caswell or [the plaintiff] that they were free to leave even though Wisconsin law does not require a license plate within 48 hours of the purchase of a vehicle." Id. (citing Wis. Stat. §341.04). He alleges that "Officer Bartel had no legal basis to continue to hold Ms. Caswell and [the plaintiff] after the license plate inquiry was satisfied" and that "Officer Bartel unnecessarily extended the stop to wait for the K9 unit to arrive by writing 2 warnings for violations[,]" which Bartel "admits . . . didn't apply to Ms. Caswell." Id.

The plaintiff states that "Officer Chris Wendorf of the Clintonville Police Department received a call from Dispatch at approximately 12:01 am on November 19 and arrived on scene approximately ten minutes after he was

6

called." Id. He alleges that "Officer Wendorf walked the K9 around their vehicle, and upon information and belief, the K9 unit did not give any reliable indication that it had smelled an odor indicating the presence of illegal drugs." Id. "Despite this," the plaintiff continues, "Officer Wendorf indicated that a search of the vehicle was warranted." Id.

The plaintiff alleges that officers ordered him and Ms. Caswell to exit the vehicle. Id. Once they were out of the vehicle, Bartel searched the plaintiff and Ms. Caswell without their consent. Id. The plaintiff alleges that Bartel "denied" Ms. Caswell's "request for a female officer to conduct the search of her person[,]" and that "during the search, Officer Bartels hands twice made contact with her groin/vagina area over her pants, and with an open palm." Id. The plaintiff asserts that during Bartel's search of him, Bartel "grabbed [the plaintiff's] penis outside of his clothes" and when the plaintiff protested, Bartel stated, "'You'd be surprised where people hide things Jason.'" Id. at 3-4.

The plaintiff alleges that "Officer Bartel and Officer Kizewski then searched the vehicle and alleged that they located marijuana 'shake.'" Id. at 4. But the plaintiff claims that the officers did not present anything to him and Ms. Caswell or show them any "shake;" he says that when he asked whether officers had "tested" the alleged "shake," "Ofc. Kizewski threaten[ed] a parole violation if the officers test[ed] it." Id. The plaintiff alleges that the officers then completed a full search of the vehicle, "including but not limited to the entire trunk area[.]" Id. He asserts that "the officers found nothing illegal" and that "radio traffic in fact reflects Ofc. Bartel saying 'no find'." Id. The plaintiff claims

7

that "Ofc. Bartel issued warnings to Ms. Caswell for non-registration of an automobile and operating without an adequate muffler[,]" even though "Ms. Caswell had violated neither law[.]" Id.

The plaintiff alleges that during the traffic stop he "was not free to leave, as no rational man just gets out of the passenger seat of a car that is pulled over and walks away." Id. The plaintiff then summarizes his allegations related to the November 2020 traffic stop:

> Officer Bartel lacked probable cause or reasonable suspicion to stop the vehicle driven by Devon Caswell because the vehicle "did not have an inadequate muffler" the exhaust was completely lawful, as he himself admits to Ms. Caswell when issuing her the warning anyway. The vehicle was not yet required to have license plates. Officer Bartel had no right to extend the traffic stop to wait for the arrival of the K9 unit by issuing unlawful warnings or unnecessary papers. Officer Wendorf did not have any reasonable basis to indicate that the K9 alerted the presence of illegal drugs. Officer Bartel had no reasonable suspicion to conduct searches of Devon Caswell and [the plaintiff], and his searches included assaultive contact of their private parts. Officer Bartel and Officer Kizewski had no right to conduct a search of the vehicle. Officer Kizewski and Sgt. Wendorf failed to intervene at multiple occasions to prevent the known violations of Ms. Caswell's and [the plaintiff's] rights. Ofc. Bartel misrepresented the teams own lie about finding "THC shake in the center console . . ." by relaying to [the plaintiff's] ES Agent that the "THC shake" was found on the "Passenger Side Floorboard" where [the plaintiff] was sitting. He then filed a false police report that states after he grabbed [the plaintiff's] penis, [the plaintiff] started "yelling and called him a faggot". No such event occurred. It's fictional. [The plaintiff], being a bi-sexual male, knows it's a homophobic slur aimed at himself.

Id. at 4-5.

The plaintiff also asserts that, "[i]n the 7-day period following the traffic stop, [he] and Ms. Caswell file[d] formal complaints[.]" Id. at 5. The plaintiff avers that "[t]he Police Chief [then] issued a 'press release' of only 7 minutes of

8

far-away dash cam footage of the traffic stop[,]" which could neither confirm or disprove the events the couple alleged. Id.

2. *"[F]ear [C]ampaign"*

The complaint next alleges that "[l]ater, [the] Clintonville Police Department, with the full awareness and/or participation of Chief Craig Frietag, launch[ed] a fear campaign" against the plaintiff. Id. He asserts that this "fear campaign" included "a call from a restricted number and the complete refusal of the chief to identify himself even though [the plaintiff] explains that he contacted an attorney for the events above, and he needed his name for the record." Id. The plaintiff alleges that, "[m]ost [d]isturbingly, [a] total of three Welfare-Checks were dispatched to Ms. Caswell's residence (where the couple were often found) in just that week long period, though it was made clear that the couple didn't want to see any police after the way they had been treated." Id.

The plaintiff says that the third welfare check occurred on Thanksgiving Day 2020, and that for this check "Clintonville Police asked the Waupaca County Sheriff's for an 'Agency Assist'" because of the couple's pending complaint against the Clintonville Police. Id. at 5-6. The plaintiff alleges that "Deputy Besel knocked on the door in a fashion that initiated a reasonable and foreseeable flight response from the couple and the children (G.H. and R.H.)[,]" which "result[ed] in the observable (to any officers watching live stream from inside the home) and severe emotional distress of everyone in the apartment" as well as "the physical injury of 18 month old G.H." Id. The plaintiff states,

9

"Nobody answered repeated requests by the couple to 'identify yourself there are children here.'" Id. at 6. The plaintiff also alleges that "[d]eputies were seen outside looking into the couples' vehicle, but not looking after the welfare of anyone inside the home." Id.

The plaintiff criticizes the Clintonville Police Department's response to the various welfare checks. Id. He alleges that "[a]lthough actively watching and reporting to Waupaca Deputies . . . the chief and officers under his command, fail to report anything meaningful regarding the actual welfare of those in the apartment." Id. The plaintiff states that the Clintonville Police Department "wisely acknowledged" that they had a "Conflict of Interest" due to the plaintiff's pending complaint. Id. The plaintiff asserts that "[t]he fact that [the Clintonville Police Department] acknowledge[s], act[s] on, and then ignore[s] the conflict, spells Intent." Id. The plaintiff continues, "This being done covertly and remotely, while watching the couple and the children's[] fear, and an 18 month old child's physical injury, via [the plaintiff's] Facebook Live Stream, and denying any knowledge the next day smells loudly of it's Maliciosness [sic]." Id. Finally, the plaintiff avers that "[t]he Chief saying he didn't report these things Intentionally because he 'didn't want to get involved' makes retaliation the only possible explanation for this conduct." Id.

3. *Theft Arrest*

The plaintiff next alleges that "[i]n October of 2021[2] [he] was Illegally arrested by the police chief and the captain for theft." Id. The plaintiff

---

[2] This was almost a year after the events surrounding the traffic stop.

10

claims that this arrest occurred when he was "removing 2 tires from a vehicle [the plaintiff's] friend said belonged to him, and that it was stolen from him." Id. The plaintiff avers that, "[e]ven after providing the license plate number to him, [the plaintiff's] friend said it was his car." Id. The plaintiff explains that "[his] friend was on the phone and told the police he had been mistaken even before they arrested [the plaintiff]." Id. He says that "[w]hen the police came to talk to [the plaintiff] at the apartment Ms. Caswell lives in, [the plaintiff] let them speak to [his friend] where he removed any real doubt that the tires weren't stolen but that a mistake had been made." Id. The plaintiff asserts that "[t]his removed reasonable suspicion of intent to permanently deprive an owner of property." Id.

The plaintiff explains that on the day he removed the tires he had told Officer Kyzewski—who "was parked nearby"—about "what was happening." Id. at 6-7. The plaintiff states that Kyzewski "did nothing to stop [the plaintiff]" and "instead [they] took a playful bet on which exhaust pipe would launch its contents further." Id. at 7. The plaintiff explains that, at the time, he did not realize that Kyzewski was one of the officers involved in the November 2020 traffic stop because Kyzewski "looked different due to a beard." Id.

The plaintiff alleges that "[t]he Chief and captain arrested [him]" the day after he removed the tires, "even after [the plaintiff] told them it was illegal because [he] didn't intend for anyone to be deprived of their property, in fact [the plaintiff's] intent was to prevent that from happening." Id. The plaintiff says that "[t]he police knew [his] friend[']s car was parked nearby, and the story

11

made sense, but they arrested [the plaintiff] in front of everyone standing outside anyway." Id. The plaintiff "believe[s] this arrest was done in retaliation for the civil rights complaints against the Police Department." Id.

          4.   *Records Requests*

The plaintiff alleges that, "[w]hen requesting records about the arrest, [he] recieved [sic] a call from the chief that [he] could ONLY get records from their attorney." Id. (capitalization in original). The plaintiff claims that "[t]his is done to make it unnecessarily difficult to investigate claims" and that "[t]his restriction also treats [him] fifteenth than literally anyone else in our country[3] as the rules governing open records in Wisconsin." Id. The plaintiff says that "[h]aving to submit the request in writing is another restriction imposed by this department." Id. The plaintiff avers that "[he has] been unable to access records, despite multiple requests to view them on site[,]" and that [he has] yet to be invited on site." Id. The plaintiff asserts that "[r]ecords were withheld and not acknowledged (radio from Thanksgiving, viewing video of officers watching live stream Thanksgiving[)]." Id.

The plaintiff alleges that "Ofc Bartel claims to have profiled [him] because of interactions with the department—[the plaintiff] should have recieved [sic] reports as these 'cons are 100% fictional, they couldn't provide them.[']" Id. The plaintiff says that "[he] was trying to prove [he] was profiled for being with Ms. Caswell, and because of [his] name in that town." Id. The plaintiff admits that "[he] was in trouble a lot prior to 2001," but questions how Bartel could

---

[3] The court is unfamiliar with the meaning of being treated "fifteenth."

"possibly be 'familiar' with [the plaintiff]" since "[t]hat was 19½ years prior" and Bartel "didn't even work there." Id. The plaintiff states that since 2001 he has not had "any interactions [with police] besides a couple traffic stops with no issues other than traffic violations." Id. The plaintiff says that "it's hard to provide proof, uncover more possible claims, or file documents as speedily as [he] would like." Id. The plaintiff "believe[s] the denial of access is to prevent the proof from being public and to delay the filing of a civil suit in this matter." Id.

The plaintiff states that "[he] tried to get a Mandamus hearing for the open records denials, but [he] think[s] [he] didn't file a summons and it was thrown out." Id. The plaintiff claims that he is "STILL being denied equal access to records as the rest of the country [he] live[s] in." Id. at 8 (capitalization in original).

     5. *Relief Requested*

Under the title "relief wanted," the plaintiff specifies the claims he is bringing against each of the six named defendants and the damages he seeks from them. Id. at 8-9, 12.[4] The plaintiff lays out his claims and the damage he seeks as follows:

> Defendant Chief C. Freitag - $4,000,000 in Compensatory and Punitive Damages for failing to supervise and train staff under his command. Even worse, the Chief was only involved when Lying to explain and cover up events described in this Complaint. And for his apparent involvement in the Thanksgiving "welfare check" and for arresting me illegally in October.

---

[4] The "relief wanted" section begins on page twelve of the complaint and continues on pages eight and nine. Dkt. No. 1 at 8-9, 12. The "relief wanted" related to defendants Chief Freitag and Captain Schroeder is handwritten, while the remainder is typed. Id.

Defendant Captain D. Schroeder - $4,000,000 in Compensatory and Punitive damages for failing to supervise and train staff under his command. And for Illegally Arresting Me in October 2021.

**Defendant Sgt. Wendorf** $3,000,000 in compensatory and punitive damages for failing to supervise and train Officers under his command. For failing to intervene at any meaningful point during events surrounding the traffic stop on November 18-19th. For lying about a dog "hit". For allowing the illegal search and Detainment, improper touching. Sgt Wendorf was involved further in requesting help from Waupaca County On November 26, 2020 (Thanksgiving) to avoid a "conflict of interest" and still kept radio or other contract with officers in an inappropriate advisory capacity. Being the 3rd welfare check in the 7 days following the initial traffic stop, and where obvious apparent injury (physical and mental) is admittedly being seen on video by officers in the Clintonville Police Department.

**Defendant Ofc. Bartel** $3,000,000 in compensatory and punitive damages for his involvement in the initial traffic stop November 18-19th, 2020. The decisions to profile, stop, detain, search, sexually assault, falsify reports were Ofc. Bartels. I believe it was at Ofc Bartel's request that everything began to snowball. He is responsible for the "seed crystal" that made this all happen.

**Defendant Ofc. Kyzewski** $3,000,000 in compensatory and punitive damages for his involvement in the initial traffic stop November 18-19th, 2020. The decisions to profile, stop, detain, search, sexually assault, falsify reports were Ofc. Bartels, but Ofc Kyzewski is very involved in these events. At no time does he intervene to stop the violations happening in front of him.

**Defendant City of Clintonville** $7,000,000 in compensatory and punitive damages as they turned a blind eye to these events even though it was known to everyone in the city administration. I videoed all the events described and made them very public, emailed the members of city council, wrote the mayor, and more. But they let this continue. Their policies bred this behavior.

Id. (emphasis and capitalization in original). The plaintiff seeks "[d]eclamatory and injunctive judgments to stop treating [the plaintiff] like Described[,]" as well as "[a]ny other relief either punitive or compensatory or declamatory, as

14

the court sees fit." Id. at 9. The plaintiff states, "I don't want to live in fear of the police anymore." Id.

C.    Analysis

1.    *Federal Claims*

Many of the plaintiff's allegations related to the November 2020 traffic stop and his October 2021 arrest appear to assert violations of his Fourth Amendment right to be free from unreasonable search and seizure. U.S. CONST. amend. IV. A person may bring claims of constitutional violations against state officials or actors through 42 U.S.C. §1983, a federal civil rights statute. See Bublitz v. Cottey, 327 F.3d 485, 488 (7th Cir. 2003) ("Section 1983 is not itself a source of any substantive rights, but instead provides the means by which rights conferred elsewhere may be enforced."). As discussed above, to prevail on a §1983 claim, the plaintiff must allege facts showing that (1) he was deprived of a right secured by the Constitution or laws of the United States; and (2) the person who deprived him of that right was acting under color of state law. Buchanan-Moore, 570 F.3d at 827 (citation omitted). Under §1983, "a public employee's liability is premised on her own knowledge and actions, and therefore requires evidence that each defendant, through her own actions, violated the Constitution." Aguilar v. Gaston-Camara, 861 F.3d 626, 630 (7th Cir. 2017) (citing Burks v. Raemisch, 555 F.3d 592, 594 (7th Cir. 2009)). "[T]o be liable under §1983, the individual defendant must have caused or participated in a constitutional deprivation." Pepper v. Village of Oak Park, 430 F.3d 805, 810 (7th Cir. 2005) (quotation omitted).

15

a.    The November 2020 traffic stop—Bartel, Wendorf and
      Kyzewski

Regarding the November 2020 traffic stop, the plaintiff alleges that

Officer Bartel, Sgt. Wendorf and Officer Kyzewski violated his Fourth

Amendment right to be free from unreasonable search and seizure. Dkt. No. 1

at 3-5, 8-9.

i.    **Bartel**

The plaintiff first alleges that Bartel unlawfully "profiled" and "stopped"

him and Ms. Caswell.

"Traffic stops are seizures, so they must be reasonable under the

circumstances." United States v. Cole, 21 F.4th 421, 427 (7th Cir. 2021) (citing

Whren v. United States, 517 U.S. 806, 809 (1996)). "Whether the driver

actually committed a traffic infraction is irrelevant for Fourth Amendment

purposes so long as there was an objective basis for a reasonable belief he did."

United States v. Lewis, 920 F.3d 483, 489 (7th Cir. 2019). "Because traffic

stops are typically brief detentions, more akin to Terry stops than formal

arrests, they require only reasonable suspicion of a traffic violation—not

probable cause." Cole, 21 F.4th at 427 (citing Rodriguez v. United States, 575

U.S. 348, 354 (2015)).

The complaint states no facts to support the plaintiff's claim that Bartel

"profiled" him. This allegation appears on page 8 of the complaint, where the

plaintiff lists each defendant and recounts the claims he makes against them.

Dkt. No. 1 at 8. A page earlier, in a paragraph where he talks about the fact

16

that he has been unable to access records relating to the events described in the complaint, the plaintiff said,

> Ofc Bartel claims to have profiled me because of interactions with the department – I should have received reports as these 'cons are 100% fictional, they couldn't provide them. I was trying to prove I was profiled for being with Ms. Caswell, and because of my name in that town. I was in trouble alot [sic] [prior to 2001. He didn't even work there. That was 19½ years prior. How could he possibly be "familiar" with me? I haven't been in s [sic] any interactions besides a couple traffic stops with no issues other than traffic violations. So it's hard to provide proof, uncover more possible claims, or file documents as speedily as I would like. I believe the denial of access is to prevent the proof from being public and to delay the filing of a civil suit in this matter.

Dkt. No. 1 at 7. The plaintiff appears to be alleging that he has information from Bartel, or admissions from Bartel, that Bartel was profiling the plaintiff. But the plaintiff does not explain what this information is; to the contrary, he says that he had not been able to obtain records. He appears to be speculating that Bartel was profiling him because he'd been in trouble in the past. The court has explained that conclusory allegations are not sufficient to support a claim; the same is true for speculative allegations. The court will not allow the plaintiff to proceed on a claim that Bartel profiled him.

As for the plaintiff's claim that Bartel unlawfully stopped the vehicle, the plaintiff's own allegations demonstrate that he cannot state a claim for a Fourth Amendment violation based on the stop. The plaintiff acknowledges that Ms. Caswell's vehicle was not displaying a license plate. That was sufficient to provide Bartel with an objective, reasonable basis for stopping the car. The asserts that after the stop, Ms. Caswell explained to Bartel that the vehicle had been purchased only the day before. He also asserts that under Wisconsin law,

17

a driver is not required to have a license plate within forty-eight hours of purchasing a vehicle. Both of those things might be true, but they have no impact on whether, at the time he *stopped* the vehicle, Bartel had a reasonable suspicion of a traffic violation. The court will not allow the plaintiff to proceed on a Fourth Amendment claim that Barter unlawfully stopped the vehicle.

The plaintiff next alleges that after Ms. Caswell provided Bartel with the paperwork relating to the car, Bartel nonetheless went to his vehicle, called dispatch and requested a K-9 unit. He alleges that Bartel wrongfully prolonged the stop—a ruse to keep the car there until the K-9 unit could arrive—by issuing two unlawful warnings. The plaintiff asserts that Bartel "had no legal basis to continue to hold Ms. Caswell and [the plaintiff] after the license plate inquiry was satisfied." Dkt. No. 1 at 3.

"An officer who reasonably starts a traffic stop . . . might violate the Constitution if he exceeds the scope or unreasonably prolongs the stop." <u>Lewis</u>, 920 F.3d at 491. "A traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket.'" <u>Id.</u> (quoting <u>Rodriguez</u>, 575 U.S. at 354-55); <u>see also</u> <u>United States v. Avila</u>, 106 F.4th 684, 695 (7th Cir. 2024) ("A traffic stop is unlawfully prolonged when police detour from the mission of the stop."). "[A]n officer may not prolong an otherwise-lawful traffic stop in order to conduct a dog sniff" and noting that a case "becomes problematic . . . only when an officer, having no legal basis to keep a suspect in place, drags [his] feet during a traffic stop to

18

give a trained dog time to arrive"). United States v. Johnson, 93 F.4th 383, 387-88 (7th Cir. 2024).

At the screening stage, the court must accept as true the facts alleged in the complaint. At this early stage, the plaintiff has alleged sufficient facts to proceed on a Fourth Amendment claim that Bartel unlawfully prolonged the traffic stop so that he could conduct a K-9 search.

The plaintiff next alleges that after the K-9 arrived (but did not alert), someone ordered Ms. Caswell out of the car and Bartel searched her. He says that Bartel denied Ms. Caswell's request to have a female officer conduct the search and that during the search, Bartel twice made contact with Caswell's groin/vaginal area with his open palm. He does not allege that Bartel's search of Caswell revealed any contraband or evidence.

> A defendant who objects to the search of a particular area bears the burden of proving a legitimate expectation of privacy in the area searched. *Rawlings v. Kentucky*, 448 U.S. 98, 104 . . . (1980). A defendant cannot assert a privacy interest on behalf of someone else. Indeed, a defendant charged with a crime of possession can only claim the benefits of the exclusionary rule if his or her own Fourth Amendment rights have been violated. *United States v. Salvucci*, 448 U.S. 83, 85 . . . (1980). Additionally, a defendant must show a privacy interest not only in the seized good, but also in the area where the good was found. *Id.*

United States v. Mendoza, 438 F.3d 792, 795 (7th Cir. 2006). The defendant cannot challenge Bartel's search of *Ms. Caswell*, and the court will not allow him to proceed on a Fourth Amendment claim against Bartel based on Bartel's search of Caswell.

19

The plaintiff alleges, however, that Bartel then ordered the plaintiff out of the car, searched the plaintiff and grabbed the plaintiff's penis outside of the plaintiff's clothes.

> The "touchstone" of the Fourth Amendment analysis is whether a person has a "constitutionally protected reasonable expectation of privacy." *Oliver v. United States*, 466 U.S. 170, 177 . . . (1984) (quoting *Katz v. United States*, 389 U.S. 347, 360 . . . (1967) (Harlan, J., concurring)). The Fourth Amendment does not protect every subjective expectation of privacy, but those expectations "that society is prepared to recognize as 'reasonable.'" *Id.* (quoting *Katz*, 389 U.S. at 361 . . . ): *see also Smith v. Maryland*, 442 U.S. 735, 740-41 . . . (1979). Assessing whether a search violated a person's Fourth Amendment rights "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell* [*v. Wolfish*], 441 U.S. [520], at 559 . . . [(1979)].

Henry v. Hulett, 969 F.3d 769, 776-77 (7th Cir. 2020). "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell, 441 U.S. at 559.

Accepting as true the facts that the plaintiff has alleged, he has stated a claim against Bartel for a violation of his Fourth Amendment right against unreasonable searches. He has implied that there was no reason for Bartel to search him, and he alleges that the way Bartel conducted the search—grabbing his penis—was unreasonable. The court will allow the plaintiff to proceed on a Fourth Amendment unreasonable search claim against Bartel based on Bartel's search of the plaintiff's person.

The plaintiff next alleges that Bartel (along with Officer Kyzewski) searched the vehicle and claimed to find marijuana crumbs (despite showing

no proof of that to the plaintiff and Ms. Caswell, and despite the "radio traffic" reflecting that Bartel said "no find." The complaint does not explain who owned the car (although it implies that Ms. Caswell purchased it and that it belonged to her). If the plaintiff merely was a passenger in Ms. Caswell's car, he may not have a Fourth Amendment claim. See, *e.g.*, Rakas v. Illinois, 439 U.S. 128, 148 (1978); United States v. Smith, 697 F.3d 625, 630 (7th Cir. 2012); United States v. Walker, 237 F.3d 845, 849 (7th Cir. 2001). More relevant, "[i]n order to succeed in a § 1983 suit, a plaintiff must 'establish not only that a state actor violated his constitutional rights, but also that the violation *caused* the plaintiff injury or damages.'" Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1032 (7th Cir. 2019) (quoting Roe v. Elyea, 631 F.3d 843, 863-64 (7th Cir. 2011) (emphasis in original). The plaintiff has not alleged that Bartel's search of the car, albeit allegedly without probable cause, caused him injury; he has not alleged that Bartel found any contraband, that he was arrested, that he was charged with any offense or that his supervision was revoked. The court will not allow the plaintiff to proceed on a Fourth Amendment claim against Bartel for unlawfully searching the car.

Next, the plaintiff alleges that Bartel issued Ms. Caswell warnings for failing to register the car and for operating without an adequate muffler. The plaintiff asserts that Ms. Caswell hadn't violated the cited ordinances. As the court already has observed, the plaintiff cannot raise a claim for *Ms. Caswell*; if Ms. Caswell believes her rights were violated, she must raise that claim herself. The plaintiff cannot proceed on a claim that Bartel violated Ms. Caswell's rights

by issuing her citations for ordinance violations she did not commit. But the plaintiff also asserts that Bartel issued these citations to delay the traffic stop until the K-9 officer arrived. The court will allow the plaintiff to add this allegation to his claim that Bartel unlawfully prolonged the traffic stop (to give time for the K-9 officer to arrive) by issuing citations.[5]

The plaintiff alleges that Bartel falsely told the plaintiff's probation agent that "THC shake" was found on the passenger-side floorboard of the car; the plaintiff say he was sitting on the passenger side. In other words, the plaintiff alleges that Bartel lied to his probation officer. Similarly, he alleges that Bartel filed a police report falsely asserting that after Bartel searched him, the plaintiff started yelling and calling Bartel a "faggot." "'[A] police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way.'" Anderson v. City of Rockford, 932 F.3d 494, 510 (7th Cir. 2019) (quoting Whitlock v. Brueggemann, 682 F.3d 567, 580 (7th Cir. 2012)). "To establish such a violation, the plaintiff[] must demonstrate not only that the defendant officers 'created evidence that they knew to be false,' Petty [v. City of Chicago], 754 F.3d [416], at 423 [(7th Cir. 2014)], but also that the evidence was used 'in some way' to deprive them of liberty, Whitlock, 682 F.3d at 580." Id. The plaintiff has not alleged a due process violation. While he alleges that Bartel

_____

[5] The court has found that the plaintiff alleged no injury from the alleged unlawful search of the car. Arguably, however, he *has* alleged an injury from the alleged unlawful postponement of the stop of the car. That postponement allegedly allowed Bartel to conduct an unreasonable search of the plaintiff's person—one that involved touching the plaintiff's genitals.

lied to his probation officer and in his police report—something law enforcement officers unquestionably should not so—he has not alleged that those lies were used against the plaintiff to deprive him of his liberty. The court will not allow the plaintiff to proceed against Bartel on his claim that Bartel lied to the plaintiff's probation officer and in his police report.

In summary: The court will allow the plaintiff to proceed against Bartel on claims that he unlawfully prolonged an otherwise lawful vehicle stop and that he conducted an unreasonable search of the plaintiff's person. The plaintiff may not proceed on any other claims against Bartel.

ii. **Kyzewski**

The plaintiff's first claim against Kyzewski is that he, along with Bartel, searched the vehicle and claimed to have found marijuana shake. As the court has explained, the plaintiff has not stated a claim—against either Bartel or Kyzewski—for this allegedly unlawful search because he has not alleged that he suffered an injury as a result. Similarly, the plaintiff alleged that when he asked the officers whether they had tested whatever they claimed to have found in the car, Kyzewski "threaten[ed] a parole violation if the officers test[ed] it." Dkt. No. 1 at 4. He implies that he stopped protesting or contesting the search because Kyzewski threatened to tell his probation officer. The Supreme Court has said that a search may be valid "as long as the police do not convey a message that compliance with their requests is required." Florida v. Bostick, 501 U.S. 429, 435 (1991). But even accepting that the plaintiff stopped demanding to have any alleged contraband tested because he believed

23

Kyzewski was threatening to report him to his probation officer, the search already had occurred at that point and again, the plaintiff has not alleged that he suffered any injury (such as an unlawful arrest, a prosecution or revocation of supervision). The court will not allow the plaintiff to proceed on his claim that Kyzewski threatened a parole violation if the officers tested the alleged shake.

The plaintiff next alleges that Kyzewski failed to intervene "at multiple occasions to prevent the known violations of Ms. Caswell's and [the plaintiff's] rights." Dkt. No. 1 at 5. Again, the plaintiff cannot bring a failure-to-intervene claim on Ms. Caswell's behalf. To state a failure-to-intervene claim on his own behalf, the plaintiff must allege that Kyzewski knew that other officers were about to violate the plaintiff's rights, that Kyzewski had a realistic opportunity to do something to prevent the harm from occurring, that Kyzewski failed to take reasonable steps to prevent the harm from occurring and that his failure to act caused the plaintiff to suffer harm. See Seventh Circuit Pattern Jury Instruction 7.22. The plaintiff's allegations are too vague to state a claim. He has not alleged that Kyzewski was aware that other officers were about to violate his rights—for example, he has not alleged that Kyzewski was aware that Bartel was going to conduct an unreasonable search of the plaintiff. He has not alleged that Kyzewski had a realistic opportunity to stop any unlawful activity—for example, he has not alleged that Kyzewski saw Bartel conduct the allegedly unreasonable search or saw Kyzewski make contact with the plaintiff's genitals. And this means he has not alleged that Kyzewski's failure to

act caused him to suffer harm. The court will not allow the plaintiff to proceed on a claim that Kyzewski failed to intervene.

Finally, the plaintiff mentions Kyzewski in his discussion of his October 2021 arrest, but he makes no claims against Kyzewski relating to that incident. He says only that the day he was removing the tires from his friend's vehicle, he told Kyzewski what he was doing and they joked about it. Dkt. No. 1 at 6-7.

The court will dismiss Kyzewski as a defendant.

### iii. **Wendorf**

The plaintiff alleges that Wendorf—who, unlike Bartel and Kyzewski, is a sergeant—got the call from dispatch around midnight on November 19 and showed up about ten minutes later. The plaintiff says that Wendorf walked the K-9 officer around the vehicle and, even though the plaintiff believes that the K-9 didn't alert, nonetheless "indicated that a search of the vehicle was warranted." Dkt. No. 1 at 3. The plaintiff makes no further allegations regarding Wendorf's involvement in the events of the November 18-19 stop and search.

The plaintiff assumes—perhaps correctly—that Wendorf was the supervisor of the other officers. The mere fact that Wendorf was a supervisor is not sufficient to subject him to liability under §1983. "A supervisory liability claim under § 1983 requires a showing that the supervisor knew about [a] constitutional violation and was personally involved in it." Cielak v. Nicolet Union High School Dist., 112 F.4th 472, 479 (7th Cir. 2024) (citing Gill v. City of Milwaukee, 850 F.3d 335, 344 (7th Cir. 2017)). The plaintiff must plausibly

25

allege "that the supervisor played some role in the conduct through facilitation, approval, or turning 'a blind eye for fear of what they might see.'" Hess v. Garcia, 72 F.4th 753, 768 (7th Cir. 2023 (quoting Kemp v. Fulton County, 27 F.4th 491, 498 (7th Cir. 2022)).

The plaintiff's allegations that Wendorf walked the K-9 officer around the car and, even though the K-9 officer allegedly did not alert, Wendorf instructed others to search the car are not sufficient to state a claim against Wendorf. Again, the plaintiff has not alleged any injury from Wendorf's actions—he has not alleged that he was arrested or charged or had his supervision revoked. He has not alleged that Wendorf was present during, or aware of, Bartel's alleged unreasonable search of the plaintiff. In his summary of allegations against Wendorf, the plaintiff accuses Wendorf of failing to intervene and allowing an improper search and "improper touching," but again, he has not alleged that Wendorf was present or aware of the allegedly unreasonable search of the plaintiff.

The plaintiff also asserts for the first time on page 8 of the complaint that Wendorf "was involved further in requesting help from Waupaca County On November 26, 2020 (Thanksgiving) to avoid a 'conflict of interest' and still kept radio or other contract [sic] with officers in an inappropriate advisory capacity." Dkt. No. 1 at 8. The plaintiff continues, "Being the 3rd welfare check in the 7 days following the initial traffic stop, and where obvious apparent injury (physical and mental) is admittedly being seen on video by officers in the Clintonville Police Department." Id. The plaintiff's allegations are too vague to

26

state a claim against Wendorf for any participation he may have had in the Thanksgiving Day welfare check. Asking for help from another law enforcement agency during a welfare check, or being in contact with other officers during a welfare check, does not violate the Constitution. The plaintiff has not alleged that Wendorf knew that this was the third welfare check in the week after the traffic stop, or that Wendorf viewed the video or knew that anyone was suffering injury.

The court will dismiss Wendorf as a defendant.

### iv. **Schroeder**

The body of the complaint does not mention Captain Dennis Schroeder of the Clintonville Police Department. The plaintiff does allege that in October 2021, he was illegally arrested "by the police chief and the captain for theft" in the incident where the plaintiff was removing two tires from his friend's vehicle. Dkt. No. 1 at 6. And in recounting his claims against Schroeder, the plaintiff alleges that Schroeder failed to supervise and train staff under his command and illegally arrested the plaintiff in October 2021. Dkt. No. 1 at 12, 8. The court will assume that the "captain" against whom the plaintiff makes these allegations is Schroeder.

The plaintiff's allegations that Schroder arrested him even after being presented with evidence that the plaintiff hadn't stolen the tires sounds like a false arrest claim. To state a civil rights claim for the constitutional tort of false arrest, a plaintiff must alleged that the defendant arrested the plaintiff and that he did not have probable cause to do so. <u>See</u> Seventh Circuit Pattern Jury

Instruction 7.07. "The existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer for false arrest . . . ." Jump v. Village of Shorewood, 42 F.4th 782, 788 (7th Cir. 2022) (quoting Abbott v. Sangamon County, 705 F.3d 706, 713-14 (7th Cir. 2013)). Probable cause to arrest exists "when a reasonable officer with all the knowledge of the on-scene officers would have believed that the suspect committed an offense defined by state law." Id. at 789 (citing Jones v. Clark, 630 F.3d 677, 684 (7th Cir. 2011)).

The plaintiff implies that Schroeder could not have had probable cause to arrest him. He says that his friend—the friend from whose car the plaintiff removed the two tires—told the officers (presumably including Schroeder) that they were mistaken and that the car belonged to him. He says that he told the police his arrest was illegal because he removed the tires, not to deprive his friend of them but to prevent someone else from doing so. He says that when he removed the tires, Kyzewski was parked nearby and the two joked about it. As the court has explained, at the pleading stage the court must accept the plaintiff's allegations as true. The court will allow the plaintiff to proceed on a false arrest claim against Captain Schroeder.

The court will not allow the plaintiff to proceed on a failure-to-train/supervise claim against Schroeder. The plaintiff does not allege any facts to support this claim, asserting only a conclusory allegation relating to Schroder in his summary of claims. "[F]ailure to train claims are usually maintained against municipalities, not against individuals . . . ." Brown v. Budz, 398 F.3d 904, 918 (7th Cir. 2005) (quoting Sanville v. McCaughtry, 266

28

F.3d 724, 739-740 (7th Cir. 2001)). The plaintiff has not alleged that Schroeder supervised any of the other defendants, or that he was responsible for training them.

v.   **Frietag**

The plaintiff first alleges that in the week after the November traffic stop, he learned that "The Police Chief" had issued a press release showing "only 7 minutes of far-away dash cam footage of the traffic stop." Dkt. No. 1 at 5. He asserts that this video didn't show what happened, that there was better video available and that the video that was released had been "trimmed at both ends." Id. In his summary of his claims against Frietag, the plaintiff does not mention this, and he does not explain which of his constitutional rights he believes the release of this video may have violated. Although the plaintiff asserts aims that Frietag "was only involved when lying to explain and cover up events described in this complaint," dkt. no. 1 at 12, he does not identify the alleged lies or describe the alleged cover-up. The court will not allow the plaintiff to proceed on a claim against Frietag based on the alleged press release containing a shortened video clip.

The plaintiff next alleges that Frietag was fully aware of, and participated in, the alleged "fear campaign" that the Clintonville Police Department conducted against him. Dkt. No. 1 at 5. He claims that he received a telephone call from a restricted number and that Frietag refused to identify himself, although the plaintiff asked for the caller's name. He describes the three welfare checks in the week after the traffic stop. He makes specific allegations

29

about the third check, conducted on Thanksgiving Day 2020, during which he says he, Ms. Caswell and two children were subjected to severe emotional distress and one child was physically injured. He says that "the chief and officers under his command, fail to report anything meaningful regarding the actual welfare of those in the apartment." Id. at 6. The plaintiff alleges that the chief said that "he didn't report these things Intentionally because he 'didn't' want to get involved,'" which the plaintiff believes "makes retaliation the only possible explanation for this conduct." Id.

The plaintiff appears to allege that because he filed complaints against either the police department itself or individual officers, Frietag retaliated against him by calling him and refusing to give his name and by ordering unnecessary and intrusive welfare checks (one of which allegedly resulted in injuries). A retaliation claim arises under the First Amendment. To state a First Amendment retaliation claim, a plaintiff must show that he engaged in activity protected by the First Amendment, that an adverse action was taken against him and that his protected conduct was "at least a motivating factor of the adverse action." Holleman v. Zatecky, 951 F.3d 873, 878 (7th Cir. 2020) (citing Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009)).

For the sake of screening, the court will assume that the plaintiff engaged in activity protected by the First Amendment—he alleged that in the week after the November traffic stop, he filed formal complaints. Dkt. No. 1 at 5. The complaint alleges that Frietag took adverse actions against him— specifically, ordering unnecessary and intrusive welfare checks to be conducted

at his residence.[6] And though his allegations are thin, the plaintiff has asserted that the only explanation for him to be subjected to three welfare checks in the week following the traffic stop was retaliation. It is a close call, but the court finds that the plaintiff has stated the bare bones of a First Amendment retaliation claim against Frietag.[7]

The plaintiff next alleges that Frietag (whom he calls "the police chief") arrested him without probable cause in October 2021, in the incident involving the plaintiff's removal of the tires from his friend's car. The court has allowed the plaintiff to proceed on a false arrest claim against Schroeder; for the same reasons, it will allow the plaintiff to proceed on a false arrest claim against Frietag, because the plaintiff has alleged that Frietag personally was involved in the arrest.

Next, the plaintiff alleges that when he tried to obtain records about the October 2021 arrest, he got a call from Frietag telling the plaintiff that he could obtain the records only from "their attorney." Dkt. No. 1 at 7. The plaintiff also says that he must submit the request in writing—a restriction he describes as having been imposed "by this department." Id. The plaintiff says that this

---

[6] The plaintiff asserts that the phone call he received from a restricted number, in which the caller did not identify him- or herself, was from Frietag. Even if that is true, it is not clear how that constitutes an adverse action that rises to the level of a constitutional violation.

[7] The plaintiff appears to allege that the officers who conducted the Thanksgiving Day 2020 welfare check called in backup from the Waupaca Sheriff's Department to avoid a "conflict of interest," then fostered that conflict by communicating with the Waupaca deputies. This is an allegation of an ethical violation, not a constitutional one.

31

makes it unnecessarily difficult for him to obtain the records he needs and that it treats him differently than anyone else in the country. Id. As pled, these allegations do not appear to state a claim for a constitutional violation. The plaintiff has not alleged that Frietag has refused to give him the documents he seeks; he has alleged that Frietag has required the plaintiff to obtain the documents from (presumably) the city attorney, and to ask for them in writing. The plaintiff has not alleged that this violates any Wisconsin or federal open records laws. And though he says that these restrictions treat him differently than anyone else in the country, he has not stated a basis for a Fourteenth Amendment equal protection claim.

The Fourteenth Amendment protects people from "purely arbitrary government classifications, even when a classification consists of singling out just one person for different treatment for arbitrary and irrational purposes." FKFJ, Inc. v. Village of Wurth, 11 F.4th 574, 588 (7th Cir. 2021) (quoting Geinosky v. City of Chicago, 675 F.3d 743, 747 (7th Cir. 2012)). Such a claim by one person is called a "class-of-one" equal protection claim.

> Class-of-one claimants carry a heavy burden. *See Woodruff v. Mason*, 542 F.3d 545, 554 (7th Cir. 2008). To support its class-of-one claim, [the plaintiff] must show [he] was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Geinosky*, 675 F.3d at 747 (quoting *Enquist* [*v. Oregon Dep't of Agric.*], 553 U.S. [591] at 601 [. . . (2008)]; *see generally Village of Willowbrook v. Olech*, 528 U.S. 562, 564 . . . (2000) (seminal case).

> To satisfy the "similarly situated" element, [the plaintiff] and [his] comparators must be "*prima facie* identical in all relevant respects or directly comparable . . . in all material respects." *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 799 (7th Cir. 2015) (alteration in

original (quoting *United States v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008)).

Id.

The plaintiff has made only a conclusory allegation that being required to ask the city attorney in writing for the information he seeks subjects him to different treatment than anyone else. He has not identified other individuals—comparators—who have been able to obtain information without having to ask the city attorney in writing. He has not alleged facts supporting a conclusion that the chief intentionally is treating him differently than people situated similarly to him, without a rational basis for doing so. The court will not allow the plaintiff to proceed on a Fourteenth Amendment class-of-one claim against Frietag.

### vi.    **City of Clintonville**

The plaintiff alleges that the City of Clintonville "turned a blind eye to these events even though it was known to everyone in the city administration." Dkt. No. 1 at 9. He says that he "videoed all the events described and made them very public, emailed the members of city council, wrote the mayor, and more," but that "they let this continue" and that their "policies bred this behavior." Id.

Section 1983 prohibits a "person" acting under color of state law from violating another person's civil rights. "A municipality is a 'person' under §1983 and may be held liable for its own violations of the federal Constitution and laws." First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago, 988 F.3d 978, 986 (7th Cir. 2021) (citing Monell v. Department of Social Services,

33

436 U.S. 658, 690-91 (1978)). "Municipal liability under <u>Monell</u> carries an important limitation: the statute does not incorporate the common-law doctrine of *respondeat superior*, so a municipality cannot be held liable for the constitutional torts of its employees and agents." <u>Id.</u> (citing <u>Monell</u>, 436 U.S. at 690-91). To prevail on a §1983 claim against a municipality a plaintiff must show that "the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." <u>Thomas v. Cook Cnty. Sheriff's Dep't</u>, 604 F.3d 293, 303 (7th Cir. 2010) (citing <u>Monell</u>, 436 U.S. at 690).

The plaintiff claims that the City of Clintonville's policies "bred" the constitutional violations alleged against the named officers. Dkt. No. 1 at 9. This allegation insufficient to state a claim for <u>Monell</u> liability. The plaintiff has not identified any policies, practices or customs that resulted in the November 2020 traffic stop, the welfare checks, the "fear campaign," the October 2021 arrest or the plaintiff's difficulties getting the information he needs.

It seems more likely that the plaintiff meant to allege his failure-to-train/supervise claim, which he alleged against Schroeder, against the city. As the court has noted, such claims usually are alleged against a municipality rather than an individual defendant. Again, the plaintiff has not alleged a specific custom, policy or practice that caused the constitutional violations he alleges.

34

The closest the plaintiff comes to stating a Monell claim (and it isn't really a failure-to-train or supervise claim) is his assertion that the city's requirement that he make a written request to the city attorney to get the information he wants makes it more difficult for him to get the information he needs to file this lawsuit or file other grievances. But the plaintiff has not stated that the city has a *policy* or *custom* of requiring people to make written requests to the city attorney for documentation. In fact, he appears to assert the opposite—he alleges that he's the only person required to make written requests to the city attorney for information.

The plaintiff has not stated a Monell claim against the City of Clintonville.

### vii.  **Summary**

In summary: The court will allow the plaintiff to proceed against Bartel on claims that he unlawfully prolonged an otherwise lawful vehicle stop and that he conducted an unreasonable search of the plaintiff's person. It will allow the plaintiff to proceed against Schroeder on a false arrest claim based on the events that occurred in October 2021. It will allow the plaintiff to proceed against Frietag on claims of false arrest and retaliation. The court will dismiss all other defendants.

### 2.  *State Claims*

Beyond the plaintiff's federal claims, he appears to allege state law claims for intentional infliction of emotional distress based on the "fear campaign" he claims the officers launched against him. Dkt. No. 1 at 5-6. It is possible he

35

also may be trying to allege a state-law claim based on the difficulties he has encountered in obtaining information.

a.     Intentional Infliction of Emotional Distress

Under Wisconsin law, a plaintiff must demonstrate the following elements for an intentional infliction of emotional distress claim: "(1) that the defendant's conduct was intentioned to cause emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct was a cause-in-fact of the plaintiff's emotional distress; and (4) that the plaintiff suffered an extreme disabling emotional response to the defendant's conduct." Rabideau v. City of Racine, 243 Wis. 2d 486, 501 (Wis. 2001) (citing Alsteen v. Gehl, 21 Wis. 2d 349, 359-60 (Wis. 1963)). "There must be something more than a showing that the defendant intentionally engaged in the conduct that gave rise to emotional distress in the plaintiff; the plaintiff must show that the conduct was engaged in *for the purpose* of causing emotional distress." Id. at 503 (emphasis added). "In order for conduct to reach the standard of being extreme and outrageous, that conduct must be such that an average member of the community would find it to be a complete denial of the individual's dignity as a person." Gianoli v. Pfleiderer, 209 Wis. 2d 509, 523-24 (Wis. Ct. App. 1997) (citing Alsteen, 21 Wis.2d at 359-60)).

The plaintiff has alleged the first element of an intentional infliction of emotional distress claim—by alleging that the welfare checks were ordered to retaliate against him, the plaintiff implies that Frietag ordered them to cause him distress. It is not clear from the allegations in the complaint, however,

36

whether Frietag's conduct in ordering the welfare checks (and in allegedly calling the plaintiff but not identifying himself) was extreme or outrageous. The plaintiff does not explain what happened at these welfare checks. If the officers simply knocked on the door and enquired if everything was alright, such conduct could not be extreme or outrageous. And while the plaintiff has alleged that the welfare checks caused severe emotional distress to everyone in the apartment (and, he says, resulted in injury to a child), he has not explained what caused the distress, how the child was injured or the nature of his own emotional distress. The court will not allow the plaintiff to proceed against Frietag for intentional infliction of emotional distress on these allegations.

>    b.    Records Request Claim

Wisconsin's public record laws "favors disclosure" of records, so there is a "general presumption of openness." Democratic Party of Wis. v. Wis. Dep't of Just., 372 Wis. 2d 460, 471 (Wis. 2016); see also State ex rel. Richards v. Foust, 165 Wis. 2d 429, 433 (Wis. 1991) ("There is a presumption that the public has the right to inspect public records unless an exception is found."). Because of this, "[e]xcept as otherwise provided by law, any requester has a right to inspect any record." Wis. Stat. §19.35(1)(a); see also Democratic Party of Wis., 372 Wis. 2d at 471 ("Wisconsin law does recognize three types of exceptions to this general policy of open access: (1) statutory exceptions; (2) common law exceptions; and (3) public policy exceptions."). "The enforcement provision of the law provides that, if an authority denies or delays access to a record after a written request for release of the record is made, then the

requester 'may bring an action for mandamus asking a court to order release of the record.'" <u>Wisconsin State Journal v. Blazel</u>, 407 Wis. 2d 472, 488 (Wis. Ct. App. 2023) (quoting Wis. Stat. §19.37(2)(a)). That means that the proper way for a plaintiff to challenge the denial of his records request would be to bring an action for mandamus.

The plaintiff acknowledges that he has previously brought a mandamus action in state court. Dkt. No. 1 at 7-8; <u>see also</u> <u>Jason Cotter v. City of Clintonville</u>, Waupaca County Circuit Court Case No. 2022CV70 (publicly available at https://wcca.wicourts.gov).[8] A federal civil rights case is not the appropriate vehicle for the plaintiff to generally challenge a denial of his record requests. To the extent the plaintiff intended to bring a claim based on the denial of his record requests, the complaint fails to state a claim.

In summary, the court concludes that the plaintiff has failed to sufficiently state any state law claims.

## III.  Request for the Court to Appoint Counsel

### A.  <u>Background</u>

In the complaint, the plaintiff "request[s] that the court appoint an attorney to navigate the complexity of these claims." Dkt. No. 1 at 8. The plaintiff explains that he is "no lawyer" and that "[o]utside of stating what happened—[he] simply [does not] know how to proceed." <u>Id.</u> at 7-8. The plaintiff

---

[8] The publicly available record reflects that the petitioner filed a petition for a writ of mandamus on March 17, 2022 and that the court dismissed the action on May 19, 2022. <u>Cotter</u>, Waupaca County Circuit Court Case No. 2022CV70 (publicly available at https://wcca.wicourts.gov).

says that he "need[s] real help stopping this" and that "[he] tried to get a Mandamus hearing for the open records denials, but [he] think[s] [he] didn't file a summons and it was thrown out." Id. The plaintiff asserts that he is "STILL being denied equal access to records as the rest of the country [he] live[s] in." Id. at 8 (emphasis in original). Finally, the plaintiff says he is "scared of committing a procedural error and then they have a license to get away with all this." Id.

B.    Legal Standard

In a civil case, the court has discretion to recruit a lawyer for individuals who cannot afford to hire one. Navejar v. Iyola, 718 F.3d 692, 696 (7th Cir. 2013); 28 U.S.C. §1915(e)(1). "[D]eciding whether to recruit counsel 'is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases.'" Henderson v. Ghosh, 755 F.3d 559, 564 (7th Cir. 2014) (quoting Olson v. Morgan, 750 F.3d 708, 711 (7th Cir. 2014)).

In exercising its discretion, the court must make the following inquiries: "(1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself?" Pruitt v. Mote, 503 F.3d 647, 654 (7th Cir. 2007). To satisfy the first prong, the court must determine that a plaintiff made a good faith effort to hire counsel. Pickett v. Chi. Transit Authority, 930 F.3d 869, 871 (7th Cir. 2019). "This is a mandatory, threshold inquiry that must be determined before moving to the

second inquiry." <u>Eagan v. Dempsey</u>, 987 F.3d 667, 682 (7th Cir. 2021). "The second inquiry requires consideration of both the factual and legal complexity of the plaintiff's claims and the competence of the plaintiff to litigate those claims." <u>Id.</u> When considering the second prong, the court "must examine the difficulty of litigating specific claims and the plaintiff's individual competence to litigate those claims without counsel." <u>Pennewell v. Parish</u>, 923 F.3d 486, 490 (7th Cir. 2019). "The question is not whether the *pro se* litigant would be as effective as a lawyer, but rather whether the difficulty of the case, factually, legally, and practically, exceeds the litigant's capacity as a layperson to coherently litigate the case." <u>Id.</u> This includes "all tasks that normally attend litigation," such as "evidence gathering, preparing and responding to court filings and motions, navigating discovery, and putting on a trial." <u>Id.</u> at 491. The court "must consider the plaintiff's literacy, communication skills, education level, litigation experience, intellectual capacity, psychological history, physical limitations, and any other characteristics that may limit the plaintiff's ability to litigate the case." <u>Id.</u>

Given the scarcity of *pro bono* counsel resources, the court may also consider the merits of a plaintiff's claim and what is at stake. <u>Watts v. Kidman</u>, 42 F.4th 755, 764 (7th Cir. 2022). "[E]ven where a litigant's claim is nonfrivolous and factually and legally plausible such that it survives §1915(e)(2) screening, the recruitment of counsel is unwarranted if the plaintiff's chances of success are extremely slim." <u>Id.</u> at 766 (quotation omitted).

C.  Discussion

"The court usually requires a petitioner to show that he has contacted at least three lawyers to establish that he made a reasonable attempt to hire counsel on his own." Devroy v. Boughton, Case No. 22-cv-727-pp, 2023 WL 4059112, at *4 (E.D. Wis. June 19, 2023). The court also "typically requires [a plaintiff to] submit[] letters from several attorneys declining assistance and copies of any documents that show Plaintiff tried to find an attorney." Astramsky v. Geisler, Case No. 23-2146, 2023 WL 7300534, at *2 (C.D. Ill. Nov. 6, 2023) (citing Olson, 750 F.3d at 711). Because the plaintiff has not stated that he has tried to find an attorney on his own, the court cannot find that he has made a reasonable attempt to obtain counsel and the court must deny his request for appointed counsel. See Eagan, 987 F.3d at 682.

Even if the plaintiff had provided the court with proof that he'd contacted at least three lawyers without success, the court still would not appoint counsel for him. Most people who file lawsuits on their own are not lawyers and do not have legal training. Many don't have the resources to hire a lawyer. Most, if not all, would like a lawyer appointed to help them. As the court has explained, there simply are not enough volunteer lawyers to take the cases of every single person who asks. The plaintiff's complaint is clearly written and, in most instances, easy to follow. He has explained what happened to him and the court has been able to follow that explanation and screen his complaint. The next step in the process will be for the court to order the U.S. Marshals Service to serve the complaint on defendants Bartel, Schroeder and Frietag. Those

41

defendants then will have the opportunity to either answer the complaint or file some other sort of pleading. There is nothing for the plaintiff to do at this point, and nothing with which an attorney could assist him.

The court will deny the plaintiff's request "without prejudice." If, later in the case, procedures become too complicated for the plaintiff to handle on his own, he may renew his request for the court to appoint him a lawyer.

## IV. Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

The court **DISMISSES** defendants Kyzewski, Wendorf and the City of Clintonville. The court **DISMISSES** all claims other than those specifically allowed in this order.

The court **DENIES WITHOUT PREJUDICE** the plaintiff's request for the court to appoint counsel.

The court **ORDERS** the U.S. Marshals Service to serve a copy of the complaint and this order on defendants Freitag, Schroeder and Bartel under Federal Rule of Civil Procedure 4. Congress requires the U.S. Marshals Service to charge for making or attempting such service. 28 U.S.C. §1921(a). Although Congress requires the court to order service by the U.S. Marshals Service, it has not made any provision for either the court or the U.S. Marshals Service to waive these fees. The current fee for waiver-of-service packages is $8.00 per item mailed. The full fee schedule is provided at 28 C.F.R. §§0.114(a)(2), (a)(3).

42

The U.S. Marshals Service will give the plaintiff information on how to remit payment. The court is not involved in collection of the fee.

The court **ORDERS** that defendants Freitag, Schroeder and Bartel must answer or otherwise respond to the complaint within the time allowed by the Federal Rules of Civil Procedure.

The court **ORDERS** that the parties must not begin discovery until after the court issues a scheduling order setting deadlines for discovery and dispositive motions. The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the Clerk of Court of any change of address. It is the plaintiff's responsibility to notify the court if he changes addresses; if he does not keep the court advised of his address the court may dismiss this case without further notice.

Dated in Milwaukee, Wisconsin this 31st day of December, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**